Thank you, Your Honor, and may it please the Court, the last time this case was argued the central issue in the case was the burden letter. And in my view, in this instance, the central issue in the case, once again, ought to be the burden letter and the evidence put forward by RJR that it was the concealment of the burden letter that reflected negatively, particularly on the validity of our patents. But I also think I inherently prejudice the trial adversely to my particular client in a way that this Court's decision in Magna How do we know if, let's assume for a moment that this was a tainting effect, but how do we know if it really ruined the whole trial so we have to start over again? That's a pretty hefty remedy. How do we know we should go that far? I think there are a couple of things the Court ought to take into account in trying to evaluate that. First of all, this is the slide. It's their last substantive slide. So I guess I would trust RJR to have made its own judgment about what was going to have the strongest, most dramatic impact. They saved it for the end in order to have it as the vision that the jury would take with it into the jury deliberations. It seems to me you ought to give them the benefit of the doubt under those circumstances. There was a distinct objection to raising anything with respect to this information at the closing argument. We filed a motion in limine saying there should be no discussion of the burden letter in the closing, and the judge expressly and categorically rejected that. But didn't that maybe go too far to ask for no discussion of the burden letter because in some ways the burden letter could be pertinent? Well, I would argue that there's almost no way in which the burden letter could be pertinent to anything. It's not prior art. It doesn't really get you anywhere. Other than the fact that we know from the first proceeding that obviously this letter, for whatever reason, seems to have a much greater emotive effect than you might expect for something that is a one-page letter that's not prior art, that describes circumstances that even Professor Burton didn't particularly well understand. But it was the central reason why Judge Garbus dismissed the claim in the first place on an equitable conduct grounds, finding his court found had no support in the record. And I would again say that given that RJR has made this particular point, and also given that it's reasonably clear that Judge Garbus was not serving the normal function as a filter to make sure that prejudicial information wasn't going to be provided, because as he said specifically, I'm not changing my view of what the evidence showed, and that's fine. I mean, he specifically rejected the notion that this court had reversed him on this ground. And so the idea that he would have been as sensitive to the prejudicial impact of the burden letter, it seems to me, is lost. What about his instructions to the jury? Well, he did not instruct the jury specifically in connection with this part of it. He obviously allowed the matter to go in. And we're placed in an impossible position, because how are we supposed to rebut something that we think shouldn't be even mentioned or discussed as part of these proceedings? I didn't see anything from the district court saying that he thought it was appropriate to retry inequitable conduct. He said the opposite, right? Well, he said the opposite, to be sure. But that's not the part of this that's offensive, Judge Dyke. What's offensive in this context is the whole idea of putting before the jury concealment of the burden letter, which, according to RJR, is a significant and material fact. But did that happen more than during the closing argument? Sure. I read the closing argument. I read the slide. I read all the other references that you have there. And I agree that during the closing argument and in the slide, there was a suggestion of impropriety. There was a specific objection to that. But the other references that you cite don't suggest impropriety. Am I mistaken about that? Yeah, I think you are, Judge Dyke. And I'll give you the specific references. It's the cross-examination of Johnny Williams. He's the inventor, specifically asked, did you provide this information under these circumstances? That's at 454, 3-1, and 3-2. And then in the primary expert witness, 46661, specifically asking him, did they provide that important information or did they withhold that from the PTO under those circumstances? But that apparently was in response to your contention that everything that was pertinent was before the PTO and that the jury ought to defer to the PTO's judgment as to the patentable nature. Right. And that's an unassailable legal proposition in the first instance. And second, burden is not prior art. So it didn't have to be. And this Court specifically said it wasn't material. And second of all, and probably in some respects even more important, there was other evidence. They could have relied on Totten specifically and said there were other references that could have served as prior art if they wanted to make that argument. It was easy to do. You didn't need to talk about burden and you certainly didn't need to talk about affirmatively concealing burden in order to make the specific point you're trying, that you're suggesting Judge Dyke. Where in the record is there a discussion about affirmatively concealing other than in the, I guess, the verbiage at the top of that slide? Well, it said holding a key document behind his back is the way it was described in closing argument. So I would assume, generally speaking, most people would infer from that that that's affirmatively concealing. One passing comment, and even if we accept that that passing comment perhaps was a little bit over the line, there's one passing comment in a full and comprehensive closing argument. Is that enough to prejudice the entire trial? I think, Judge Lind, you've got to put it in the context. The single, probably most damaging cross-examination of the inventor goes to his failure to provide a particular document that, frankly, should never have been referred to in that context. The primary witness on infringement is asked to testify about this and is asked to make the same basic point. We specifically asked the judge not to allow a discussion of this in the closing argument, the Corbett judgment. And that's only, those are the most immediate elements of it. Remember the burden letter. There are another dozen references to the burden letter involving. But as Judge Lind was asking, where else besides the closing argument is there suggestion of impropriety in the whole burden letter from the TPO? Well, I mean, I think implicit in the whole notion of asking the inventor, did you provide him with this letter, a letter that was obviously written to his counsel? And the answer is no, is a suggestion, is implicit in that, the suggestion that what you've done is improper. And if you add to that, then the closing, which ties it all up in a neat bow, then it I mean, I think it's important to go back and say, what did RJR attempt to do here? This is not, this is not just sharp elbows. This was an attempt to prejudice the jury. If you look at Magnavision, for instance. Mr. Phillips, assuming you're right on the seriousness of this, wouldn't you still draw a line between infringement and validity? This is a attack on the validity of your patent, but it doesn't say much about infringement at all, does it? It doesn't speak directly to infringement, although this court in Magnavision. So how would that be tainted? Well, this court in Magnavision said that when you go off on a frolic and detour and you go into the question of challenging the entirety of the patent, that that extends beyond validity and that that can in fact justify a new trial on all grounds. And it seems to me Magnavision applies a fortiori in this case, because Magnavision was a situation where you're just talking about the technical conduct of the patent examiner and his improprieties. Here we're talking about a claim that the inventor engaged in improprieties and acted inappropriately, which is clearly designed to say he didn't invent anything. There's nothing to this claim. And it seems to me when you, once you make that kind of an argument, it's very difficult to segregate what happened on the infringement side of this case from what happened on the, on, on the invalidity side. And basically what the court, what, what happened here, or at least what you could infer. While the court only gives us one sentence to justify his j-mal on validity, he goes into more detail on the infringement side and points out what he sees as the utter failure of Dr. Lee to, to substantiate a proof of infringement. Wouldn't we give that some weight as well? If, if the only issue on infringement were Dr. Lee, then that would probably be a fair way to approach this case. But the more fundamental problem with the infringement analysis, and you're not going to accept my argument that you ought to throw out the whole thing because of the prejudicial acts here, goes to the airflow problem that's inherent in the infringement analysis. And here is a situation where the district court and the, and RJR ignored this court's decision in 02 micro, which specifically says that you cannot ask the jury to construe certain terms inconsistent with the way those terms should be construed, that the court has an obligation to do that. And here RJR. It wouldn't make any difference if there, if you didn't present sufficient evidence to find infringement. And if the Lee testimony is excluded under Daubert, and that's not an issue that you really take issue with in the briefs. If the, if the, if the Lee testimony is excluded under Daubert, what is left that would possibly allow a jury to find infringement? Judge Dike, Judge Garbus did not, in fact, dismiss Lee on Daubert. He said, I, if I had to, I would. Well, that's a very different thing than saying that he would. But what we have before us at the moment is Lee's testimony. If Lee's excluded, there's nothing to support. Right. But what I would add, but what this. No, just to be clear, if Lee's excluded, you agree there's no evidence to support infringement. I agree with that. Yeah. But I do also, and I think it's important and I realize I'm working into my rebuttal at this point, but I, but I also want to make it very clear that if you accept the O2 micron argument and therefore that this notion of a 25,000 cubic foot from a CFM numerical standard should never have been in this case and is inconsistent and clearly inconsistent with the, with the claim construction because the claim, because the specification says it has to be, you know, has a specific example of 25,000, which is lower than the 25,000 cubic foot. If we had actually instructed the jury to examine this on the basis of the claims and not on the basis of this numerical analysis, then who knows what would have happened under those circumstances. And at a minimum, it seems to me in this case, we would be entitled to go back to a new judge and have an opportunity to have Lee evaluated independently of all of the errors that were embedded in this case. Because if you get to the end of this case and you've concluded that all of this stuff doesn't have any merit to it to begin with, which was frankly Judge Garbus's view of the world, it's pretty easy to say, well, then I'm not persuaded by what Lee did. If you go in without that bias that's been embedded in the way this case was tried, then it seems to me a fundamentally different issue. We're entitled to a fair trial, and we didn't get that this time. There are no further questions. I'll save my time for the bottom. Mr. Phillips? Ms. Addy, would you give Ms. Addy an additional two minutes, and then we'll restore a full five minutes to Ms. Phillips. Ms. Addy, you have 17 minutes if you need to use it. Good afternoon, Your Honors. Art J.R. did not improperly use the Burton letter or impliedly retry inequitable conduct, and the record does not support Starr's accusations. Maybe you should not have used the slide. Come on. I mean, it's a bad slide. I mean, it may be that there wasn't a proper objection to it. It may be it's just an isolated thing, but you can't defend using that slide, can you? You can't. I can defend that, Your Honor. Let's talk about what happened. Was that used in the first trial? No, it was not used in the first trial, Your Honor. Let's talk about what happened. It came up afterwards then? It came up in this closing. After we had told you that it's not even a material reference, and if we look at the law carefully, it's probably not even prior art. Why would that be your closing pitch? Let me explain, and there are a couple points in your question that I'd like to hit, but I think we need to put it in context first, and it was slide 116 of 141, so it wasn't the last slide in their closing argument. And in addition, Starr had a rebuttal, and Starr didn't mention it in the rebuttal, Starr didn't object to it in the closing argument, and Starr didn't ask for any sort of curative instruction from the judge. The motion in Lemonade that Starr refers to was ruled on prior to closing. Boy, I'm— So this is— I'm— There's more, Your Honor, if you let me— If somebody objected during the closing argument, I think most trial judges would land right in their lap. Closing arguments are supposed to be argumentative. You don't object to those, do you? I think there are times when you do, but let me explain the situation. But at least it's a tough call to make, isn't it? It is. The curative instruction, I think, goes more to the heart of it. But here, let me tell you what happened that caused this slide. I think that's very important. And it happened at 46-574 of the record. On cross of RJR's expert, Dr. Otten, Starr theatrically piled up eight binders of prior art in seriatim, and Starr said, quote, So the patent office had all of that stuff. Would that be fair? There was one thing the patent office didn't have, end quote. And Starr was talking about the Tono reference that Starr and the patent office didn't have at that time. And about that, Starr then said, quote, And no one knew about that. So with that, Starr gave the jury the misimpression that the patent office had everything. But that wasn't true. The patent office didn't have Dr. Bergman. Does it need cumulative, non-material evidence to make any kind of a judgment? Your Honor, on Starr 1— We told you it was immaterial. Why were you using it? Your Honor, that's not exactly what Starr 1 held. Starr 1 held that it was cumulative for the second-issued patent. The first-issued patent, Starr 1 did not rule on the materiality of the Burton letter because it ruled on intent. And it held it was cumulative in the second patent because Starr submitted RJR's interrogatory responses. But in addition to submitting RJR's interrogatory responses, Starr told the patent office that it disagreed with the contents of Starr's interrogatory responses. So what's before the patent office is interrogatory responses that discuss that Prior Art Barnes produced low-to-undetectable TSNAs and Starr's comment to the patent office that it disagreed with that. But what wasn't before the patent office was Dr. Burton's understanding that Prior Art Barnes produced low-to-undetectable TSNAs and Starr had that information and Starr knew about it. But, and Starr opened the door. It may have been one thing to present that information that way to the jury, but it's a little different when that information is cast the way it's cast in that slide. This is not. I mean, that slide has got Burton holding this letter behind his back and it says, Starr failed to disclose the Burton letter to the PTO as required. Well, Your Honor, Starr. Sounds like a commentary on intent, doesn't it? It's not only commentary on intent, but commentary intended to be inflammatory. Well, Your Honor, after the theatrical display and the judge saw it, RJR was absolutely entitled to provide the jury with the entire story and this was appropriate rebuttal on closing. In fact, the judge commented on this and he said, quote, what Starr did was misleading. And in closing, RJR was wrapping that up. But even if you believe that this was improper, you cannot look at this anew because you look at it for abuse of discretion through the eyes of the district judge and the district and you look at this for the totality of the circumstances and there's overwhelming evidence here on seven substantive issues, all of which the jury found in favor of RJR and on those issues, many of which were unrebutted by Starr, to suggest that without this slide we would have had a different outcome is crazy. Well, that's not really the question. The question is if there was error in allowing the slide, then in order to show it's harmless, you have to show that the jury had to reach the result that it did. And with respect to some of these issues, you argue that the jury was compelled to reach the result. You argue that with respect to infringement and you argue that with respect to some of the validity issues. Which of the validity issues in your view were compelled to reach this result? Well, Your Honor, for example, on obviousness, Starr argued that anaerobic conditions was key to its invention. But the Wernick article taught that TSNAs form under anoxia and anoxia is lack of air or anaerobic conditions. Dr. Wahlberg, one of the co-authors of the Wernick article, testified that her work included all the limitations of the claims. And Dr. Otten, our expert, testified that one of ordinary skill in the art would know that to alleviate anaerobic conditions, you inject fresh air. In addition, if common sense wouldn't tell you to inject fresh air, Tono, that reference that was not before the PTO, specifically taught that to alleviate anoxia, you quote, increase the airflow in the barn to avoid an anaerobic condition. And that's at 46,555 of the record. Why would one have combined tona with the Wernick prior art? Both of those were dealing with trying to get rid of anoxia. I thought tona was more dealing with odor problems. It had an odor problem issue as well, but it was also dealing with the anoxia issue. It's about 30 years earlier dealing with a different issue. Isn't the only reason you combine those a hindsight analysis? I disagree, Your Honor. Under your decisions in Kahn, it doesn't have to be for the exact same reason that one of Wernick's skill and art would combine references. But here we do. There may be different problems being solved, but they're also both dealing with the anoxia problem in the barn. Does Tono mention TSNA? Tono does not deal specifically with TSNA. It's not even talking about the same problem area. But it's dealing with a lack of air in the barn. It strikes me as hindsight. You've got the patent, and you're using that as a blueprint to find the prior art. Let's see what we can find that fits in this framework. But, Your Honor, there was substantial evidence on which the jury could have decided and did decide. And they had Wernick alone, which Dr. Wahlberg testified had all the limitations, but they had Wernick in combination with Tono. And that's how the jury found in favor of RJR. In addition, Starr offered no expert... Your Honor, on secondary considerations... Remember, you're telling us that they're compelled to reach this result. And we've already got some questions about whether you can make the combination, and you've got a pile of secondary considerations. It's not sounding to me like they're compelled to reach this result. Your Honor, on secondary considerations, there was a lack of nexus. First of all, Starr doesn't use its own process. You might be better off going on to some of the other issues, like indefiniteness. I don't mean to suggest you're not ready, but, I mean, you've got... Maybe the jury could have found out that it was the heart itself that suggested the jury was compelled to find out. You've got anticipation, you've got indefiniteness. Try something new. Your Honor, do you want me to address the secondary... I can finish it really quickly. Really fast and move on. On secondary considerations, there's a lack of nexus. Starr didn't use their own process. Brown and Williams didn't use Starr's process. And any success out there was due to Peel, which was an entirely different process. So you can't rely on secondary considerations. And again, I think under the Verizon case, the Verizon case deals with the totality of the circumstances. And in that case, it's an abusive discretion standard, and it's not a compelled to find. Although I think there's quite enough evidence that they were compelled to go that way because there's a lack of evidence in these other areas. Let's look at indefiniteness. One quick question on obviousness with respect to both the Wiernik and the Tono references. Do either one of those references discuss a lack of combustion exhaust gases? Dr. Otten testified. I don't think they specifically talk about a lack of combustion gases. So even if they properly could be combined somehow, isn't that missing? Excuse me one second. Your Honor, Tono uses a heat exchanger. And so Tono, for that reason, uses combustion gases. But to that point, Dr. Otten did testify that to remove CO2 fumes from the barn, one of ordinary skill in the art would know that what you need to do is maintain oxygen levels in the barn. So from that testimony, one of ordinary skill in the art had the evidence they needed. Turning to indefiniteness. Indefiniteness dealt with unconventional airflow. And there was testimony from three witnesses. Two of them were STARS witnesses that where the conventional airflow ends and the unconventional airflow begins, no one knew where to find that. And Sturgill, their expert admitted that he didn't know where that was. Williams admitted that he didn't know the difference between conventional and unconventional airflow. And keep in mind, this was their claim construction. And Dr. Otten testified that from the specification, he didn't know where to draw the line. And based on that testimony, there was substantial evidence upon which the jury could have determined that the claim was indefinite. Insolubly ambiguous. Insolubly. One of skill in the art's going to maybe not know instantly what the exact number is, but they're going to know how to get there pretty quick, which is all that's required, isn't it? The exact number for what, Your Honor? One of skill in the art wouldn't know whether the number that they had was conventional or non-conventional when you got to a certain level. We knew because we went out and looked at old air flows and old heat exchangers that ours was in the prior art. But if we had gotten up to some level, we wouldn't have known what was conventional and what was not conventional because that wasn't taught and the claim language didn't help us. Well, but the conventionality was for the purpose of decreasing T-S-N-A. Just use that as a benchmark for how conventional or not you were, whether or not you were really affecting T-S-N-A. How do you know when you get there and when you're conventional and when you're not? And the experts testified they just didn't know. And based on that, the jury had substantial evidence upon which they could have found indefiniteness. And they did find indefiniteness. Your Honors, I'd like to address the Magnavision case that Mr. Phillips brought up. The Magnavision case is nothing like this case. It turned on an improper jury instruction on the presumption of validity. Here, there's no objection to the jury instructions. And in fact, the jury instruction was proper on the presumption of validity. In addition, in that trial, two-thirds of the testimony or of the trial days were spent on the allegedly improper testimony. And here, there was nothing wrong with the fair rebuttal that we gave when Starr opened the door. In addition, they point to mere snippets in our testimony. And finally, we have, as we mentioned, those seven other substantive issues upon which the jury could have based its decision on. So Your Honors, if there's no further questions, this was a fair and balanced trial. R.J.'s use of the letter was entirely proper and called for. There was overwhelming evidence on seven substantive issues, much of it unrebutted, upon which the jury based its decision, and this Court should affirm. Thank you, Ms. Addy. Mr. Phillips, you have five minutes, five and a half minutes. Maybe I'll give you back the half minute. Thank you, Your Honor. May it please the Court. Judge Dyke, I did misspeak when I said that if we don't have the testimony of Lee, we don't have any evidence. There is testimony from Starr that said that even if you modify the data, you look just at the data, you don't take Lee into account, that there were still seven farmers who were infringed. No, he said that Lee's data didn't show infringement. I mean, you can interpret it either way. If the standard is, could it have made a difference? And was there enough evidence there for a jury to be able to reach an opposite conclusion? The answer is, yeah, there is evidence from which a jury could have inferred that seven farmers did, in fact, infringe. It was a fair reading of that. It could have gone either way. But the point here is we're trying to figure out, what do you do with the fact that there has been a prejudicial act intentionally undertaken by the defendant in this case? And how does that play out? And all I'm suggesting is the absence of the Lee testimony would not by itself be sufficient. I'm just simply misspoke. What about indefinite? Could you address that? Because it really does seem to be rather difficult for someone to know what's conventional and what's unconventional, and what the various parameters are in the conventional thing, and how changing one of them would make a difference. It's important to put in context. Conventional curing is the language in the construction. It's not conventional airflow. And our interpretation of conventional curing has always been that we're talking about, and it's straightened out of the specification, that we're talking specifically about the equipment. And that conventional curing is conducted in a direct fire barn and in an air-cured barn. Well, that's not quite what the claim construction was that you proposed. It says controlling one or more of humidity, temperature, and airflow in the curing van in a manner different from conventional curing. It isn't saying it's using a method other than conventional curing. It's saying varying one of the parameters that exists in conventional curing. But if you look at the specification, Judge Steichen, specifically talks about conventional curing. And what it says there are the ordinary and commercially used methods that are in play. And those methods are pieces of equipment. That's true. But your claim construction doesn't say a method other than conventional curing. It says varying one of these parameters that's present in conventional curing. So the specification doesn't seem to me to help us know what the parameters are of conventional curing and what ones might be modified or not modified. No, I actually think, Judge Steichen, if you accept the notion that conventional curing is an equipment-based concept, and then you look at the rest of the claim construction in terms of what this court said in star one, which is the relationship between preventing anaerobic conditions and thereby reducing the TSNAs, then you know exactly what you're supposed to do. You're supposed to modify those other three criteria, and candidly, primarily the airflow one, in order, ultimately, to maintain and avoid an anaerobic condition and thereby reduce TSNAs. But the problem is, I don't know what the parameters are of humidity, temperature, and airflow in conventional curing. There is no standard for that. No, but conventional curing, it seems to me, Judge Steichen, doesn't change the analysis. All conventional curing does is, say, use an indirect fire barn. And then the question is, how do you manipulate that? And I at least don't understand anybody to have argued that a person of skill in the art wouldn't have known how to manipulate it if you're talking about, again, an indirect fire barn and determining that. And in any event, I thought this court decided that question in star one by saying that all you need to do is manipulate it in order to reduce TSNA levels, which is ultimately what the court did. With respect to obviousness, I'm not sure that I can add much to the questions the court already asked counsel on the other side, because it does seem to be pretty clear that this is post hoc effort to try to put together two things that nobody would have put together under those circumstances. And so then we go back to the question, it seems to me, of infringement and whether or not there's adequate. What about anticipation? If this anticipatory demonstration was public, it seemed to satisfy the claim limitations, no? No, it doesn't satisfy the claim limitations, because it's only talking about a treatment for a 24-hour period, and the claim limitation requires that the treatment be done for 48 hours. So it clearly didn't satisfy that. 48 hours, as it says, typically 48 hours. It doesn't say almost 48 hours. Actually, what it says is that we're in the treatment time is from about 48 hours, which 24 is nowhere near from about 48 hours to about two weeks. So it seems to me it's clear. And there's no dispute about that. And again, two things about this, Judge Dyke. First of all, each of these issues is essentially a question of law. These are not questions that should have been submitted to the jury. The trial court should have decided each of these in validity issues. And second of all, and maybe more important, there's no question that the effort to use that slide and the concealment evidence went directly to all of the issues of invalidity. That was the whole purpose of it, was to undermine the presumption of validity that otherwise would have existed. With respect to the slide itself, counsel suggests that it's the last slide. There were other slides. But if you look on page 43, 788 in the joint appendix, you'll see it is the last substantive slide. The next slide after that is just summary. And at that point. So the last point, substantively, they wanted to make was to prejudice this jury. It did that. We deserve it, Your Honor. No questions. Thank you. Panel will now withdraw. And we'll reconstitute ourselves for the next arguments. Thank you. All rise.